**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RIBHI HASAN and MARYAM SOOD,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **No.: 11-cv-5109** |
| | : | |
| **ALLSTATE INSURANCE COMPANY,** | : | |
| **Defendant.** | : | |

## M E M O R A N D U M

**SITARSKI, M. J.**                                                                 **April 24, 2013**

## I.      INTRODUCTION

Plaintiffs Ribhi Hasan ("Hasan") and Maryam Sood ("Sood"), husband and wife (together, "Plaintiffs"), brought this action for breach of contract and bad faith concerning a dispute over insurance coverage for losses resulting from a fire that occurred on November 29, 2010.  (Compl.¶ 4.)  A homeowners policy issued by Defendant Allstate Insurance Company ("Allstate")  was in effect at the time of the fire, but Allstate denied coverage based on purported misrepresentations made by Plaintiffs when reporting the claim.  Allstate also filed a Counterclaim alleging insurance fraud.  Currently pending before the Court is a Motion for Summary Judgment filed by Allstate (Dkt. No. 14).  For the reasons that follow, the motion will be granted in part and denied in part.

## II.      PROCEDURAL HISTORY

On July 5, 2011, Plaintiffs initiated this lawsuit by filing a Complaint against Defendant

in the Court of Common Pleas of Philadelphia County.[1]  The Complaint alleged breach of contract and bad faith.  On August 10, 2011, Defendant filed a Notice of Removal and removed this case to this court, invoking diversity jurisdiction under 28 U.S.C. § 1332.  (*See* Dkt. No. 1.)  On August 15, 2011, Defendant filed an Answer to the Complaint, as well as a Counterclaim against Plaintiffs alleging civil insurance fraud.  (Dkt. No. 4.)  This matter initially was assigned to District Court Judge Juan R. Sánchez.

On January 18, 2010, Allstate filed the instant Motion for Summary Judgment.  ("Def. Mot.")  On January 19, 2012, the parties consented to the exercise of jurisdiction by a United States Magistrate Judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, and the matter was referred to me.  (Dkt. No. 15.)  Allstate moves for summary judgment on the grounds that Plaintiffs' claims for breach of contract and bad faith are not supported by the evidence.  It also moves for summary judgment on its insurance fraud counterclaim, alleging that it is entitled to a judgment as a matter of law that Plaintiffs intentionally and fraudulently misrepresented material facts when reporting their claim.  Plaintiffs filed a Response (Dkt. No. 18), and Defendant filed a Reply (Dkt. No. 19).

III.     FACTS

A.        The Parties and the Policy

Hasan was born in Palestine, and is a naturalized United States citizen who has lived in the United States since September 23, 1996.  (Pl. Resp. ¶ 6 at 2.)  In 2002, Hasan purchased a

---

[1]  Mr. Hasan's and Ms. Sood's names appear with various spellings throughout the record. For consistency and clarity, this Court will refer to Mr. Hasan as "Hasan" and Ms. Sood as "Sood."

property located at 1643 Cadwallader Street in Philadelphia ("the Property"), of which he is the

sole owner.  (*Id.*; Def. Mot. ¶ 23 at 7.)  The Property has three floors, with each floor constituting

a separate apartment unit.  (Def. Mot. ¶ 22 at 7; Pl. Resp. ¶ 22 at 9.)  At the time of purchase,

Hasan was married to Sood, with whom he has three children born between 1996 and 1999.  (Pl.

Resp. at 2-3.)

Around August 29, 2002, Hasan purchased an Allstate Homeowner's Policy ("Policy"),

which provided insurance coverage for the Property.  (Def. Mot. ¶ 6 at 3; Pl. Resp. ¶ 6 at 2.)  The

Policy defines several key terms, including:

> 1. **"You" or "Your"** –  the person named on the Policy Declarations as the insured
> and that person's resident spouse.

> 3. **"Insured person(s)"** – you and, if a resident of your household:
>     (a) any relative; and
>     (b) any dependent person in your care.

> 12. **"Dwelling"** –  a one, two, three, or four family building structure, identified as
> the insured property on the Policy Declarations, where you reside and which is
> principally used as a private residence.

(Def. Mot. Ex. E at 11-13.)

The Policy contains several components, including coverage for the insured's dwelling

and personal property.  (*Id.*)  In "Coverage A – Dwelling Protection," the Policy states that it

covers "your dwelling including attached structures."  (*Id.* at 14.)  The Dwelling Protection

covers "sudden and accidental direct physical loss caused by damage to property described in

Coverage A – Dwelling Protection."  (*Id.* at 15.)  However, the policy disclaims coverage for

"[a]ny substantial change or increase in hazard, if changed or increased by any means within the

control or knowledge of an insured person."  *(Id.* at 16.)  The Policy also disclaims coverage in

circumstances of concealment or fraud. (*Id.* at 14.) The Policy specifically states "[w]e do not cover any loss or occurrence in which any insured person has concealed or misrepresented any material fact or circumstance." (*Id.*)

The Policy also provides "Coverage C – Personal Property Protection," which includes: "1. Personal property owned or used by an insured person anywhere in the world" and "2. At your option, personal property owned by a guest . . . while the property is in a residence you are occupying." (*Id.* at 17-18.) The Policy specifically provides that "[w]e will cover sudden and accidental direct physical loss to the property described in Coverage C – Personal Property Protection, except as limited or excluded in this policy, caused by: 1. Fire or Lightening." (*Id.* at 19.) However, the Policy does not "cover loss to the property described in Coverage C – Personal Property Protection caused by or consisting of . . . any substantial change or increase in hazard, if changed or increased by any means within the control or knowledge of an insured person." (*Id.* at 21.)

## B. Pre-Fire Background

### 1. <u>Family Living Arrangement</u>

Prior to April 2007, Hasan, Sood, and all of their children lived on the first floor of the Property, and rented out the apartments on the upper two floors. (Pl. Resp. at 43-44; Pl. Resp. Ex. I at 23.) In April 2007, Sood and the children temporarily moved to Jerusalem, while Hasan remained and continued to occupy the Property's first floor unit. (Pl. Resp. at 44; Pl. Resp. Ex. I at 13-14.) Hasan and Sood remained married and have had several more children since April 2007. (Pl. Resp. ¶ 6 at 2.)

After moving to Jerusalem, Sood periodically returned to the United States to visit her

family. (*Id.* ¶¶ 67-75 at 21-22.) When Sood visited Philadelphia she would stay overnight at her brother-in-law's house, which was a few blocks away from the Property. (Pl. Resp. at 44.) She did this because she was afraid to stay at the Property due to problems with the upstairs tenants. (*Id.*) However, Sood kept clothing and personal items at the Property, and would often visit there during the day. (*Id.*) Hasan and Sood both claim it was their intention for Sood and the children to return to Philadelphia and make the Property the "family house." (Pl. Resp. at 44; Pl. Resp. Ex. N at 27.)

In mid-November 2010, Sood and two of her children returned to the Philadelphia area from Jerusalem.[2] (Pl. Resp. Ex. F at 23.) Plaintiffs claim that Sood did not intend to return to Jerusalem, but rather that Plaintiffs intended the family to reside at the Property in Philadelphia. (Pl. Resp. Ex. M at 31.)

## 2. Relationship with Former Tenants and Neighbors

During the time Hasan owned the Property, he rented the upper two floors to non-relative tenants. (Pl. Resp. Ex. L at 22.) The two primary tenants were Ramon Vargas (second floor unit) and Rosalee Olmedo (third floor unit).[3] (Def. Mot. Ex. O-5; Def. Mot. Ex. O-6.) According to Vargas, he rented the second floor of the Property for about five years until he

---

[2] Allstate points out that Sood originally stated that she arrived with one child, as opposed to two. (Def. Mot. ¶ 27 at 8.) However, Hasan stated that Sood brought two children with her in November 2010. (Pl. Resp. Ex. F at 23.) Additionally, based on the context of Sood's recorded statement, where she stated she had one child with her, she was talking about the number of children that were with her at the time of recorded statement, not how many were in Philadelphia on the day of the fire. This does not create a genuine issue of material fact.

[3] Mr. Vargas and Ms. Olmedo's names are spelled in various ways throughout the record. For purposes of clarity and consistency, this Court will refer Mr. Vargas as "Vargas" and Ms. Olmedo as "Olmedo."

moved out in July 2010. (Def. Mot. ¶ 39 at 12.) Mr. Vargas also claimed he stopped renting the

second floor apartment because Hasan left the Property in "bad disrepair," and that when Vargas

tried to hold back rent in order to get things fixed, Hasan told Vargas that he had to move out.

(Def. Mot. Ex. O-5.) Vargas stated that when he moved out he attempted to give the keys to

Hasan, but Hasan was not available so "he just left them hanging in the door." (*Id.*) Hasan filed

a "Landlord and Tenant Complaint" against Vargas on June 18, 2010, in Philadelphia Municipal

Court, for failure to pay rent for the months of March through June of 2010. (Pl. Resp. Ex. N at

9.) On July 21, 2010, the Municipal Court found in Hasan's favor and ordered Vargas to pay

$978.00 in back rent and costs. (*Id.* at 13.)

Olmedo stated that she lived in the third floor unit of the Property from November 2009

until March 31, 2010. (Def. Mot. Ex. O-6.) Olmedo claimed that she was upset with Hasan

because of problems with the roof. (*Id.*) Olmedo held back February and March rent because

nothing was done about the roof, and subsequently moved out at the end of March. (*Id.*)

Olmedo stated that she contacted the City of Philadelphia Department of Licenses and

Inspections ("L&I") to report her concerns, and that when L&I inspected the Property, they told

Olmedo that the Property was "uninhabitable." (*Id.*) After Ms. Olmedo moved out, Hasan filed

a complaint against her in Philadelphia Municipal Court for failing to pay rent, failing to pay a

gas bill, and for damages to the Property.[4] (Pl. Resp. Ex. N at 2.) The parties consented to a

"Judgment By Agreement" whereby Olmedo agreed to pay Hasan $2,306.73 to settle the claim.

(*Id.* at 3.)

---

[4] The Municipal Court documents state that Olmedo returned her keys to Hasan when she "removed" herself from the residence. (Pl. Resp. Ex. N at 1.)

Plaintiffs also made several other statements concerning their displeasure with former tenants and neighbors. Sood stated that "nobody liked us from that area, from that whole neighborhood." (Def. Mot. Ex. I at 3.) Further, she represented that "people on the third floor, they would boil water . . . and they would throw it on my kids . . . ." (*Id.*) Sood also stated that cigarettes and condoms were thrown at her children from the second and third floor windows of the Property. (*Id.* at 4.) Finally, Hasan stated that after he obtained judgments against his former tenants "they sent me some people to fight with me . . . ." (Pl. Resp. Ex. F at 18.)

### 3. Condition of the Property

Olmedo stated that she reported to L&I the poor condition of the roof, as well as a mice and cockroach infestation. (Def. Mot. Ex. O-6.) L&I investigated the Property on April 5, 2010, and found several violations of the Philadelphia housing code. (Def. Mot. Ext. P.) The cited violations included: leaks in the plumbing fixtures on the third floor; lack of an annual test record for the fire alarm systems; lack of an "IN CASE OF FIRE . . ." sign; lack of lighting in the second floor stairwell; lack of fire extinguishers; lack of a housing inspection license; an unsanitary ceiling; a leaking roof; and a lack of self-closing doors to the units. (*Id.*) Three additional citations were issued in 2010, for similar violations.[5] (*Id.*) Notations on the last two citations indicate the violations were remedied as of October 21, 2011.[6] (*Id.*)

---

[5] The three additional notices were issued on April 19, May 10, and July 29, 2010. Def. Mot. Ex. P. The May 10, 2010 notice contained three violations not listed on the previous notices. (*Id.*) These were for an infestation of pests; failure to keep windows, doors, and frames in good condition; and, requiring the doors to be replaced. (*Id.*)

[6] The record does not indicate on what dates the specific violations were remedied. Additionally, there is nothing in the record indicating that any additional citations were issued after the last citation on July 29, 2010.

### C. Fire at the Cadwallader Property

On November 29, 2010, the Property was damaged by a fire. (Compl. ¶ 4; Answer ¶ 4.) On the morning of the fire, Hasan left the Property around 10:00 a.m., and drove to his brother's house.[7] (Pl. Resp. Ex. F at 20.) Hasan picked up his two children and his brother's children and drove to Center City to pay his bills and to distract the children, while the rest of the family prepared dinner at Hasan's brother's house. (*Id.* at 20-21.) Hasan later returned to his brother's house for the dinner party. (*Id.* at 21.)

After dinner, Hasan decided to return the Property to relax and have some time to himself. (*Id.* at 24.) Hasan maintains that upon arriving he noticed smoke coming from the Property. (*Id.*) Hasan noted that the exterior door of the home was "open already," but that he was unable to enter the Property because of the smoke. (Pl. Resp. Ex. F at 24.) The fire department, which is located about four blocks from the Property, arrived soon after. (*Id.*)

### D. Subsequent Investigation and Discovery

#### 1. Allstate's Post-Report Investigation

Hasan contacted Allstate to file a claim. (Def. Mot. ¶ 9; Pl. Resp. ¶ 9.) It is undisputed that on the day of the fire, the Policy was valid and in effect. (Compl. ¶ 4; Ans. ¶ 4.) Hasan reported to Allstate that investigators had determined someone broke into the Property through the front door and intentionally set the fire. (Def. Mot. Ex. G at 31.) Hasan also told Allstate that he had suspicions about who set the fire and had informed the police. (*Id.*) Allstate maintains that Hasan told them he lived at the Property with his six children, wife, and mother,

---

[7] Hasan originally left the Property around 8:00 A.M., but returned to pick up some bills he needed to pay. (Pl. Resp. Ex. F at 20.)

and that Hasan asked for coverage under the Policy for housing and food.[8]  (*Id.* at 29-32.)

Allstate sent adjusters and a third party investigator to determine the extent of damage and the cause of the fire.  (Def. Mot. ¶¶ 9, 12-15.)  On December 2, 2010, an Allstate Special Investigator Unit obtained a recorded statement from Hasan.[9]  (*Id.* at ¶ 16; Pl. Resp. ¶ 16.) Defendant's adjuster inspected the property and provided Hasan with an advance payment for "contents" in the amount of $1,500.  (Def. Mot ¶ 12; Def. Mot. Ex. G at 27.)  A further inspection of the personal property damaged in the fire was conducted a week later.  (Def. Mot. ¶ 13.)  Relying on the report of its "origin expert," Allstate determined that the fire was intentionally set.  (*Id.* at ¶ 41.)

Additionally, Allstate hired an investigator, Thomas Cloud, to conduct an investigation by interviewing neighbors and former tenants of the property.  (*Id.* at ¶ 15.)  Mr. Cloud conducted six interviews between December 17, 2010, and January 19, 2011, and provided Allstate with summaries of the interviews.  (*Id.* at ¶ 34; Def. Mot. Ex. O-1-0-6.)  Two of the interviewees were the former tenants, Vargas and Olmedo.  (Def. Mot. ¶¶ 39-40.)

In addition to Hasan's recorded statement on December 2, 2010, an Allstate representative spoke with Hasan and Sood on several other occasions.  Nancy Rosen obtained Sood's recorded statement on January 3, 2011.  (*Id.* at ¶ 17.)  Rosen also spoke with Hasan on January 3, 2011, and January 5, 2011.  (*Id.* at ¶¶ 46, 57.)  In addition, both Hasan and Sood

---

[8]  Plaintiffs deny that Hasan attempted to obtain coverage under the Policy for members of his family that were not in Philadelphia on the date of the fire.  (*See* Pl. Resp. ¶ 86.)

[9]  Ms. Nancy Rosen ("Rosen") conducted the interview with Hasan, which covered various topics, including family situation, financial status, and the circumstances of the fire.  (Pl. Resp. Ex. I.)

participated in an Examination Under Oath ("EUO"), with both sides represented by counsel.[10] (*Id.* at ¶¶ 18-19.) Hasan's EUO was originally scheduled to be conducted the same day as Sood's; however, Hasan had difficulty understanding the questions and required a translator.[11] (Pl. Resp. ¶ 19.) After completing its investigation, Defendant notified Hasan that it was denying his claim because "[Hasan] made misrepresentations of facts material to the claim ." (Pl. Resp. Ex. B ¶ 28.)

### 2. Plaintiffs' Alleged Material Misrepresentations

Defendant contends that Plaintiffs made seven material misrepresentations during the investigation of the claim. (Def. Mot. ¶ 85.) The subjects are as follows:

- Whether Sood resided at the Property on the date of the fire. (*Id.* at ¶ 86.)

- Who, in addition to Sood, resided at the Property on the date of the fire.[12] (*Id.*)

- How many children accompanied Sood to Philadelphia from Jerusalem in November 2010.[13] (*Id.* at ¶ 87.)

---

[10] Sood's Examination Under Oath occurred on April 6, 2011, and Hasan's occurred on April 13, 2011. (Def. Mot. ¶¶ 18-19.) These examinations were sequestered, and neither Hasan nor Sood was present for the examination of the other. (Pl. Resp. ¶ 28 n.2.)

[11] Hasan is not a native English speaker and required the assistance of an Arabic translator. (Pl. Resp. ¶ 19.)

[12] Defendant maintains that Plaintiffs made various conflicting statements about who lived at the Property. (Def. Mot. ¶ 86.) Defendant claims that Plaintiffs stated Hasan, Sood, and all six children were residing at the property, while at other times stating that Hasan lived at the property by himself. (*Id.*) Additionally, Defendant obtained several statements from neighbors claiming that Hasan has been the only resident of the Property for the last two years. (*Id.*)

[13] Defendant alleges that Plaintiffs made conflicting statements regarding whether one, two, or six children accompanied Sood to Philadelphia in November 2010. (Def. Mot. ¶ 87.)

- Where Sood was staying during her November 2010 visit.[14]  (*Id.* at ¶ 88.)

- Hasan's activities on November 29, 2010, prior to his discovery of the fire.[15]

  (Def. Mot. ¶ 89.)

- Facts concerning Hasan's discovery of the fire.[16]  (*Id.* at ¶ 90.)

- Plaintiffs' relationship with their neighbors prior to the fire.[17]  (*Id.* at ¶ 91.)


## IV.    STANDARD OF REVIEW

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing

---

[14]  In most of the occasions cited by Defendant, Plaintiffs state that Sood was staying at the home of Hasan's brother during her visit to Philadelphia.  (Def. Mot. ¶ 88.)  However, Hasan's Response to Defendant's Request for Admissions stated that Sood and two of their children "spent nights at the Property in November 2010." (*Id.*)

[15]  Defendant alleges that Hasan's December 2, 2010, recorded statement indicates that his wife and six children left the Property with him on the morning of November 29, 2010.  (Def. Mot. ¶ 89.) However, Defendant contends that later statements indicate Hasan was at the home by himself the morning of the fire and that neither Sood nor the children were with him. (*Id.*)

[16]  Defendant contends that Hasan made inconsistent statements about who called the fire department.  (Def. Mot. ¶ 90.)  It argues that on one occasion Hasan stated "we" called 911, while on another occasion Hasan stated that a girl outside had already called the fire department. (*Id.*) Additionally, Defendant claims that Hasan gave inconsistent statements concerning when he saw the fire. (*Id.*) Defendant cites Sood's recorded statement to indicate that Hasan was "at the Property for a while before neighbors ran up to him and told him that the Property was on fire." (*Id.*)  In response, Plaintiffs point out that Sood was not present when Hasan discovered the fire.  (Pl. Resp. ¶ 90.)

[17]  Most of the statements cited by Defendant indicate that Plaintiffs had some trouble with their neighbors and former tenants.  (Def. Mot. ¶ 91.)  However, Defendant relies upon Hasan's recorded statement made December 2, 2010, where he stated that he did not have problems with people in the neighborhood, and that the neighbors loved his family. (*Id.*)

11

law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if there is sufficient evidence from which a jury could find in favor of the non-moving party. *Id.*

It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. The court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) *(citing United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." *Liberty Lobby, Inc.*, 477 U.S. at 255.

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the moving party carries this initial burden, the non-moving party must "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions. *See Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992); *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Instead, the non-moving party must present specific facts and "affirmative evidence in order to defeat a properly supported motion for summary judgment." *Liberty Lobby, Inc.*, 477 U.S. at 257.

When deciding a motion for summary judgment "it is inappropriate for the court to resolve factual disputes and to resolve credibility determinations." *Big Apple BMW, Inc. v. BMW*

*of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). To raise a genuine issue of material fact for trial a party opposing summary judgment "need not match, item for item, each piece of evidence proffered by the movant." *Id.* Rather, "if the opponent has exceeded the 'mere scintilla' threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of the events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent." *Id.* It is the duty of the fact-finder to determine the "believability and weight of the evidence." *Id.*


## V.      DISCUSSION

Defendant moves for summary judgment on: (1) Plaintiffs' claim of breach of contract; (2) Plaintiff's claim of bad faith; and (3) Defendant's Counterclaim of civil insurance fraud. This Court will address these *seriatim*.

### A.      Breach of Contract Claim

The interpretation of an insurance contract is a question of law to be decided by the court. *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997). The law in Pennsylvania is well settled that when the terms of an insurance contract are clear and unambiguous, the court is required to give effect to that language. *See Med. Protective Co. v. Watkins*, 198 F.3d 100, 104 (3d Cir. 1999). When the terms of the policy are ambiguous, the court should interpret them in favor of the insured and against the insurer who drafted the contract. *See Moessner*, 121 F.3d at 900. In evaluating ambiguity, the court must construe the terms in context of the entire contract and determine "whether the contract is 'reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *Id.* (*quoting Gamble Farm Inn Inc. v.*

*Selective Ins. Co.*, 656 A.2d 142, 143-44 (Pa. Super. Ct. 1995)).

Count I alleges breach of contract. Plaintiffs contend that Defendant is required, by the terms of the Policy, to indemnify Plaintiffs for their loss, and that Defendant's denial of coverage constitutes a breach of contract. Defendant posits that there is no genuine issue of material fact on this question, and that it is entitled to judgment as a matter of law because its denial of Plaintiffs' claim was based on the plain language of the Policy.[18] Allstate argues that its coverage denial based on plain policy language was appropriate for two reasons: (1) Plaintiffs made misrepresentations regarding material facts; and, (2) Hasan's actions increased the hazard that led to the fire.

### 1.    Plaintiffs' Alleged Misrepresentation of Material Facts

The Policy states that "[Allstate does] not cover any loss or occurrence in which any insured person has *concealed or misrepresented any material fact or circumstance*." (Def. Mot. Ex. E at 14 (emphasis added)). The question of materiality is one of fact and law, "but if the facts represented are so obviously important that 'reasonable minds cannot differ on the question of materiality' then it becomes a question of law that the court can decide at the summary

---

[18]   Plaintiffs claim that Defendant's "Claim Diaries" and the interviews of former tenants cannot be used in evaluating Defendant's motion because they are inadmissible hearsay. The Federal Rules of Civil Procedure govern the standard for summary judgment in federal courts. Rule 56(c)(1)(A) states that a party can support its motion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). However, a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Applying this standard, the Third Circuit has stated that "'hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial.'" *Barr v. Cnty. of Clarion*, 417 Fed. App'x 178, 180 n.4 (3d Cir. 2011). Because both Defendant's employees and the neighbors interviewed could testify regarding their personal knowledge, the Court may properly consider this evidence.

judgment stage." *Parasco v. Pac. Indem. Co.*, 920 F. Supp. 647, 654 (E.D. Pa. 1996). The materially requirement is satisfied if the statements "would have affected the attitude and action of the insurer" or if they were "calculated either to discourage, mislead or deflect [the insurer's] investigation . . . ." *Id.*

Allstate first claims Plaintiffs misrepresented that Sood resided at the Property in November 2010. Plaintiffs contend that Sood is a resident of the Property despite acknowledging her prior presence in Jerusalem during the past few years. Plaintiffs point to Sood's Driver's License, which contains the Property's address; Hasan's financial support of Sood; the presence of Sood's possessions at the Property; the marital relationship; and, Sood's move back to Philadelphia just prior to the fire. (Pl. Br. at 6-11; Pl. Resp. at 7, 11, 17, Ex. J.) Pennsylvania courts have defined the term "resident," in the context of insurance contracts, as "those who actually reside in the household of the insured." *Amica Mut. Ins. Co. v. Donegal Mut. Ins. Co.*, 545 A.2d 343, 115-16 (Pa. Super. Ct. 1988). Additionally, Pennsylvania courts have noted that "residency" only requires presence, and intention is irrelevant to the analysis. *See Allstate Ins. Co. v. Naskidashvili*, No. 07-4282, 2009 WL 399793, at *3 (E.D. Pa. Feb. 16, 2009). Courts look at various factors to determine an individual's residence, including where they eat, sleep, keep possessions, and receive mail. *See id.* Thus, the issue of residency is a question of fact. *See id.* at *3-4.

Allstate argues that there is no genuine issue of fact that Sood did not reside in the Property. It claims that the record shows Sood was not present at the home because she slept at her brother-in-law's home upon returning to Philadelphia in November 2010, and that Sood spent considerable time in Jerusalem between April 2007 and November 2010. However, the record

also includes evidence that Sood listed the Property as her residence on her driver's license, that Plaintiffs have continued their marital relationship, and that Plaintiffs had begun the process of Sood and the family returning to live at the Property. Because the facts on summary judgment must be interpreted in the light most favorable to the non-moving party, the Court cannot, as a matter of law, determine that Sood was not a resident of the Property. Based on the evidence presented, it is possible that a reasonable fact-finder could conclude that Sood resided at the Property for purposes of the Policy and, accordingly, there was no misrepresentation.

Second, Allstate cites several instances when Plaintiffs allegedly made inconsistent statements about who, in addition to Hasan, resided at the Property. Several of the statements offered by Allstate indicate that Hasan lived at the property permanently, while Sood and the children were in Jerusalem. (Def. Mot. ¶ 86.) Allstate also points to other comments made by Plaintiffs that allegedly are inconsistent with that claim. Two statements, one from the Allstate Claim Diaries and one from Hasan's December 2, 2010, recorded statement, indicate that Hasan reported that he lived at the Property with his wife, six children, and on one occurrence, his mother. (*Id.*) Additionally, Hasan indicated in his Response to Allstate's Request for Admissions that Sood and two of their children "resided" at the property on November 29, 2010. (*Id.*) While these statements could be considered inconsistent when read in isolation, when read in the full context of the transcripts, and with evidence of Hasan's lack of fluency in the English language, the Court cannot conclude as a matter of law that these were material misrepresentations of fact.[19]

---

[19] After reviewing the Claim Diaries, we note that the exact questions asked of Hasan by the Allstate representative are unclear. Hasan's responses are also unclear and it is not possible to determine as a matter of law that he understood the questions. Because of the lack of clarity in the

Third, Allstate similarly alleges that Plaintiffs misrepresented how many children were in Philadelphia on the date of the fire. (*Id.* at ¶ 87.) Plaintiffs contend that two children accompanied Sood when she returned to Philadelphia in November 2010, but this is disputed by Allstate.[20] (*Id.* at ¶ 87; Def. Mot. Ex. N-2.) Allstate claims that Hasan stated his six children were at the Property on November 29, 2010, citing Hasan's December 2, 2010 recorded statement. (*Id.*; Plt. Resp. Ex. I at 21-23.) However, after reviewing Hasan's December 2, 2010, recorded statement, we find that genuine issues of fact exist regarding whether Hasan intended to state that his six children were at the Property on the date of the fire. (Def. Mot. ¶ 87.) Hasan never actually specified the number of children, but rather stated that his wife and his kids were not with him when he returned to the Property and discovered the fire.[21] (*Id.*) Allstate also points to a comment in Sood's recorded statement that she brought one child with her to Philadelphia in November 2010. (Def. Mot. ¶ 87.) However, I find there is a genuine issue of fact whether Sood ever said she brought only one child with her to Philadelphia in November 2010.[22] The context of the answer indicates that Sood may have been discussing how many

Claim Diaries, the Court cannot determine as a matter of law that the statements recorded therein are sufficient to constitute misrepresentations of fact. *See, e.g., infra* note 24.

[20] Allstate claims that Sood stated only one child accompanied her to Philadelphia in November 2010. (Def. Mot. ¶ 87.)

[21] After discussing Hasan's discovery of the fire, Allstate continued questioning as follows: "Q: Now was everybody with you? You, your wife and six kids?, A: My wife and my kids, when I go back home they wasn't with me. They was at my brother's house." (Pl. Resp. Ex. I at 21-22.) The questioning then changes to a different subject. Considering the context of the answer, the Court cannot conclude that Hasan intended to imply six children were with him on the date of the fire.

[22] Sood's recorded statement contains the following exchange: "Q: How many children do you have? A: I have six kids. Q: Were they all with you, too? A: No, no, just one child, the little

17

children were with her at the time of the interview, not how many children were with her in Philadelphia on the date of the fire.

Allstate also claims that immediately after the fire Hasan claimed coverage for himself, his wife, his mother, and six children. (Def. Mot. ¶ 86; Def. Mot. Ex. G at 31.) To support this claim, Allstate relies heavily on the statements recorded in the Claim Diaries. However, after reviewing the Claim Diaries, this Court finds that there is a genuine issue of fact whether Hasan was requesting coverage for his six children.[23] Thus, the Court is unable to conclude as a matter of law that the statements by Hasan and Sood regarding the number of children in Philadelphia on the date of the fire were misrepresentations of material fact.

Fourth, Allstate alleges that Plaintiffs misrepresented where Sood was staying during her time in Philadelphia. (Def. Mot. ¶ 88.) Allstate points to several statements, including Sood's recorded statement, Sood's EUO, Sood's response to Allstate's Requests for Admissions, Allstate's interviews with neighbors, and Hasan's response to interrogatories, which all indicate that Sood kept belongings at the Property, but spent nights at her brother-in-law's house. (*Id.*)

---

one. Q: How old's the little one? A: She's two years and nine months. Q: And where were the other five? A: Back home, here. Q: In California? A: No, here in Jerusalem. Q: Oh, you're in Jerusalem? A: No, I'm in California now, but my kids, they're with their mother-in-law, with their grandmom, my mother-in-law, in Jerusalem." (Pl. Resp. Ex. L at 2-3.) After reviewing this exchange, the Court cannot, as a matter of law, conclude that Sood made a misrepresentation that only one child accompanied her from Jerusalem to Philadelphia in November 2010. Rather, a fact-finder could conclude that Sood was telling the interviewer where her children were at the time of the interview.

[23] The entry on November 30, 2010, at 10:00 AM, states "ASKED WHO [Hasan] LIVES WITH AND HE SAID HIS 6 CHILDREN, MR AND MRS INSD AND HIS MOTHER." (Def. Mot. Ex. G at 31.) Plaintiffs claim that Hasan's difficulty with English raises a question of material fact as to whether this is an inconsistency. This Court agrees. This statement does not indicate the exact question asked, nor its context. It is unclear if Hasan understood the question to relate to the living situation at the time of the fire for purposes of quantifying the claim.

Allstate also points to Hasan's response to Allstate's Request for Admissions, which indicates that Sood and two children spent nights at the Property in November 2010. (*Id.*) However, Hasan responded to the Requests for Admissions *after* coverage had already been denied, and the responses could not have impacted Allstate's denial of Hasan's claim.[24] Additionally, the Requests for Admissions asked if Sood or any of the six children spent a "single" night in November 2010 at the Property. (Def. Mot. Ex. M-1.) Plaintiffs stated, "Denied. To the contrary, Sood [and two of the children] spent nights at the property in November 2010." (*Id.*) Construing the facts in favor of the non-moving party, Plaintiffs have created a genuine issue of fact that statements that Sood and her children "stayed" with her brother-in-law during November 2010 are not inconsistent if Sood spent a "single" night at the Property and spent the rest of the time at her brother-in-law's house. Thus, the Court is unable to conclude as a matter of law that the statements by Hasan and Sood regarding where Sood was staying during her time in Philadelphia were misrepresentations of material fact.

Fifth, Allstate claims that Plaintiffs misrepresented Hasan's activities on the day of the fire. (*Id*. at ¶ 89.) Allstate alleges that in December 2010, Hasan stated that he, his wife, and six children left the Property together the morning of November 29, 2010. (*Id.*) Allstate claims that this is inconsistent with statements that Sood did not sleep at the Property the night prior to the fire. (*Id.*) However, as noted above, after reviewing Hasan's December 2, 2010, recorded statement, it is not clear that Hasan claimed his wife and six children were at the Property on the date of the fire. In his December 2010 recorded statement, Hasan stated that his family left the

_____

[24] The response to the Request for Admission was given in December 2011, but as noted above, Allstate denied Plaintiffs' claim in May of 2011. (Def. Mot. Ex. N-1.)

Property the morning of the fire and that he drove his kids around Philadelphia that afternoon, but never stated who, specifically, was with him.[25]  Additionally, Hasan's December 2010 recorded statement was obtained without the aid of an Arabic translator, which may have prevented him from understanding the questions about his activities prior to the fire.[26]  Thus, the Court is unable to conclude as a matter of law that the statements by Hasan regarding his activities prior to the fire were misrepresentations of material fact.

Sixth, Allstate claims that Plaintiffs misrepresented facts regarding Hasan's discovery of the fire.  (*Id.* at ¶ 90.)  Allstate alleges that Hasan misrepresented who contacted the fire department, claiming the Claim Diaries indicate Hasan "saw smoke from where he was and called the fire department," but that on other occasions Hasan stated that "we" called 911 or that a "girl outside" called the fire department.  (*Id.*)  However, when viewed in the light most favorable to Plaintiffs, it is not clear that these statements are inconsistent.  In his EUO, Hasan never stated that he did not call the fire department, only that the neighbors called the fire department.  (Pl. Mot. Ex. F at 25.*)*  The Court cannot determine as a matter of law that this is a misrepresentation because, as Plaintiffs argue, it is possible that both the neighbors and Hasan

---

[25]  Hasan stated that when he left the Property he was the last person to leave and that he left "[w]ith my family, all of us" and that he closed the house when he was left.  (Plt. Resp. Ex. I at 19-20.)  Further, Hasan stated that he did not stay at his brother's house, but said he "[m]e and my family, you know, take the kids, we go out buy them like McDonald's, buy some things, and we take them to my brother's house."  (*Id.* at 31.)  The Court cannot determine as a matter of law that these statements are inconsistent with statements that Sood did not sleep at the Property the night of the fire.

[26]  Plaintiffs cite several examples of Hasan's lack of understanding, including the following exchange: "Q: . . . Have you understood the questions that I asked you.  A: My friend, you see my English?  How is it?  Look, I'm doing my best . . . I'm doing my best to let you understand me.  I'm doing my best to understand you. . . . Q: Have your answers been true and correct to the best of your knowledge and belief?  A: I don't know what this is.  I don't know." (Pl. Resp. Ex. I at 34.)

called the fire department.[27]

Allstate also alleges that Hasan misrepresented where he was when he discovered the fire. (Def. Mot. ¶ 90.) Allstate asserts that the Claim Diaries indicate Hasan saw smoke from "where he was," while later stating he cannot see the Property from his brother's house. (*Id.*) However, the statement from the Claim Diaries does not indicate where Hasan was when he claimed to see the smoke.[28] Because the context of the statement from the Claim Diaries is unclear, the Court cannot determine as a matter of law that this was a misrepresentation. Additionally, Allstate relies on a statement by Sood that indicates that Hasan was at the house "awhile" before he discovered the fire. (*Id.*) However, as Plaintiffs indicate, Sood was not with Hasan when he discovered the fire; therefore, Sood's interpretation of the event does not sufficiently indicate a material misrepresentation. After reviewing the facts regarding the discovery of the fire in the light most favorable to Plaintiffs, the Court cannot conclude as a matter of law that there were material misrepresentations of fact.

Finally, Allstate alleges that Plaintiffs misrepresented their relationship with their neighbors prior to the date of the fire. (Def. Mot. ¶ 91.) Except for one statement, all seven of the statements identified by Allstate indicate that Plaintiffs had some trouble with their former tenants and neighbors. (*Id.*) Allstate points to Hasan's statement in his December 2, 2010,

---

[27] Considering that the fire department actually responded to the fire, the Court reserves judgment on whether the issue of who called the fire department, if a misrepresentation, is material.

[28] The Claim Diaries state: "MR INSD TOLD ME THAT HE WENT OUT FOR A FEW HOURS AND FROM WHERE HE WAS HE WAS ABLE TO SEE THE SMOKE AND HE CALLED THE FD DEPARTMENT." (Def. Mot. Ex. G at 32.) The Court cannot determine from this statement where Hasan was when he claimed to see the smoke. Thus, construing this in favor of Plaintiffs, it is possible that "where he was" when he saw the smoke was when he arrived at the Property.

recorded statement where he claimed "I never have problem with nobody in this neighborhood, nobody (inaudible)." (Def. Mot. Ex. H at 11.) However, the record reflects a genuine issue of material fact whether Hasan meant no one other than his former tenants – with whom he clearly had issues. Immediately prior to stating that he had no problem in the neighborhood, Hasan disclosed problems that he had with his former tenants. (*Id.*) Hasan specifically told the interviewer that "[s]ince I fight with them, they stop pay me rent." (*Id.*) Thus, in his recorded statement Hasan indicated that he had no problems with the neighbors generally, but that he had problems with his former tenants. Additionally, as noted above, most of the problems cited by Hasan and Sood arose from situations involving their former tenants. Thus, when considered in the light most favorable to Plaintiffs, a reasonable jury could conclude that the statements by Plaintiffs were not misrepresentations.

In conclusion, after reviewing the facts in the light most favorable to Plaintiffs, as this Court must do on a motion for summary judgment, the Court is unable to find, as a matter of law, that Plaintiffs made material misrepresentations fact sufficient to support Allstate's denial of coverage. Plaintiffs have presented evidence from which a jury might conclude that the statements made by Hasan and Sood were not misrepresentations. Whether the statements qualify as material misrepresentations that would allow Allstate to deny coverage for the claimed loss hinge on a jury's determination of underlying facts.

## 2. Hasan's Alleged "Increase of the Hazard"

In addition to the alleged material representations, Allstate also claims that it is entitled to summary judgment on the breach of contract claim because it properly denied coverage under the Policy based upon Hasan causing an "Increase in Hazard." (Def. Mot. ¶¶ 76-83.) As noted

above, the Policy excludes coverage if "[a]ny substantial change or increase in hazard, if changed or increased by any means within the control or knowledge of an insured person." (Def. Mot. Ex. E at 16.) Allstate alleges that Hasan increased the hazard by failing to collect the keys and change the locks when the upstairs tenants moved out, and by allowing the Property "to exist in a state of disrepair." (Def. Mot. ¶¶ 78-80.)

Pennsylvania courts have interpreted an increase in hazard clause in insurance policies to require more than "a 'mere trifling increase' in risk . . . , [but] 'rather there must be a substantial and material increase, such as the insurer, in view of the terms of the policy, could not reasonably be presumed to have contracted to assume.'" *Litiz Mut. Ins. Co. v. Pennsylvania*, 401 A.2d 606, 608 (Pa. Commw. Ct. 1979). The record indicates that Hasan did not change the locks when the tenants moved out; however, Plaintiffs have presented evidence that both tenants returned their keys upon moving out.[29] (Def. Mot. Ex. H at 12; Pl. Resp. Ex. N.) Thus, there is a genuine issue of fact whether Plaintiff substantially increased the hazard by failing to secure the Property after the tenancies ended.

Allstate claims that the L&I citations for various housing code violations also increased the hazard of fire. Plaintiffs argue that the violations were the result of damage done by the former tenants and not the conduct of Hasan. (Pl. Br. at 12.) Beyond explaining that the Property was in some state of disrepair, Allstate does not make clear how the specific violations substantially increased the hazard. After reviewing the violations cited by L&I, only two violations appear relevant to a potential increase in fire hazard: the lack of annual test records of

---

[29] As noted above, Plaintiffs presented evidence that Ms. Olmedo returned the keys to Hasan and that Mr. Vargas left them in the door when he moved out.

the fire alarm systems on file with L&I, and the lack of a fire extinguisher at the Property.[30]

Because there is no dispute that no one was home at the time the fire started, there is a genuine

issue of fact whether a properly tested alarm system and a fire extinguisher would have reduced

the damage to the Property.

After reviewing the facts in the light most favorable to Plaintiffs, this Court cannot

determine as a matter of law that Plaintiffs caused an increase in the hazard substantial enough to

warrant a denial of coverage under the Policy.  Plaintiffs have provided evidence that the former

tenants returned their keys when they moved out.  Further, Allstate has failed to indicate how the

cited violations and Plaintiffs' failure to change the locks create a "substantial increase" in

hazard, such that Allstate would not have originally entered into the Policy.  Moreover, there is a

---

[30]  It is unclear to the Court how the other violations (leaks in plumbing, failing to have an electric light in every room, replacement of window frames, bath access for every room, pest infestations, licensing for a multifamily residence, repair of the ceiling and doors) are relevant to a potential increase in fire hazard.  These violations may be important, and in some instances could jeopardize one's ability to operate a multifamily housing unit, but they do not appear to have an impact on an increase in fire hazard.  Also, the Court notes that while it also may be important to have a sign mounted above a fire alarm box, a violation for not having the sign does not appear to increase the hazard of a fire, particularly where the fire occurred when no one was present in the building.

Additionally, Plaintiffs claim that Hasan had embarked on several renovations after the tenants moved out of the Property.  *Id.;* Plt. Resp. to Def. Mot. Summ. J. Ex. F at 10-11.  Hasan received four citations from L&I between April and July 2010, with the last two citations indicating that the violations were complied with by at least October 2011.  However, the citations do not indicate whether October 21, 2011, was the date on which Hasan remedied the violations or when L&I reinspected the Property to confirm compliance.  There is no evidence in the record that L&I issued any additional citations regarding the Property after July 2010.  Thus, there is a genuine issue of fact whether Hasan had remedied the violations that were relevant to increase in fire hazard prior to the occurrence of the fire in November 2010.  Neither party has presented sufficient evidence for the Court to determine as a matter of law whether Plaintiffs did indeed remedy such violations prior to the fire.  Because it is unclear how the violations substantially increased the hazard and when the violations were specifically remedied, the Court cannot determine that the violations were a substantial increase in hazard.

genuine issue of fact whether the violations were remedied before the fire occurred. Whether the actions by Plaintiffs are a "substantial hazard" that would allow Allstate to deny coverage under the Policy hinge on the determination of underlying facts.

Accordingly, Allstate's motion for summary judgment on Plaintiffs' breach of contract claim must be denied.

### B.       Bad Faith Claim

Pennsylvania statute 42 Pa. C.S.A. § 8371 allows for a cause of action against an insurer for bad faith. The statute states:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an among equal to the prime rate of interest plus 3%.
>> (2) Award punitive damages against the insurer.
>> (3) Assess court costs and attorney fees against the insurer.

42 Pa. C.S.A. § 8371. The statute itself does not define bad faith, but the Pennsylvania courts have defined it as "'any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent.'" *O'Donnell ex rel. Mitro v. Allstate Ins. Co.,* 734 A.2d 901, 905 (Pa. Super. Ct. 1999) (quoting *Romano v. Nationwide Mut. Fire Ins. Co.*, 646 A.2d 1228, 1232 (Pa. Super. Ct. 1994)). Further, in "'an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e. good faith and fair dealing), through some motive of self interest or ill will; mere negligence or bad judgment is not bad faith.'" *Id.*

In order to succeed on a bad faith claim a plaintiff must show "'(1) that the insurer

lacked a reasonable basis for denying benefits; and, (2) that the insurer knew or recklessly disregarded its lack of reasonable basis.'" *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999) (quoting *Klinger v. State Farm Mut. Auto Ins. Co.*, 115 F.3d 230, 233 (3d Cir. 1997)). An insured bringing a bad faith claim must meet the heightened standard of "clear and convincing evidence." *See MGA Ins. Co. v. Bakos*, 699 A.2d 751, 754 (Pa. Super. Ct. 1997). The standard of review is critical because it heightens a plaintiff's burden in opposing a motion for summary judgment. *See Quaciari v. Allstate Ins. Co.*, 998 F. Supp. 578, 581 (E.D. Pa. 1998) (citing *Liberty Lobby, Inc.*, 447 U.S. at 254).

Plaintiffs allege that Allstate committed bad faith by: (1) attempting to utilize Hasan's lack of fluency in English to create inconsistent statements in order to deny coverage; (2) "elevating" Sood's residency status to a level of importance, to which it was not entitled, in order to deny coverage; (3) relying on "self-serving statements" of persons whom Plaintiffs suspected of starting the fire; and, (4) failing to identify factual reasons for denial of coverage despite Plaintiffs request. (Pl. Br. at 14-17.) Allstate argues that is entitled to summary judgment because Plaintiffs have presented only "boiler plate" allegations of bad faith and that they have failed to produce any evidence that Allstate's conduct was "unreasonable unfounded, reckless or motivated by ill-will." (Def. Br. at 15-16.)

Plaintiffs respond that there are genuine issues of material fact preventing entry of summary judgment on the bad faith claim because the record indicates that Allstate relied extensively on self-serving statements and took advantage of Hasan's lack of knowledge of the English language to deny coverage. (Pl. Br. at 14-17.) Additionally, they point to Allstate's refusal to identify specific reasons why the claim was initially denied as evidence that Allstate

did not have a reasonable basis to deny the claim. (*Id.* at 15.) Allstate responds that its decision was reasonable because it reasonably believed that Plaintiffs made misrepresentations of material fact and that Plaintiffs substantially increased the hazard, which are both reasons for rescission under the Policy. (Def. Br. at 15-16.) In conducting its investigation, Allstate claims it acted promptly in response to Plaintiffs' claims, took multiple statements from various parties, retained a cause and origin expert, and interviewed former neighbors and tenants. (*Id.*)

While an insurer has a duty to investigate claims fairly and objectively, *see Diamon v. Penn Mut. Fire Ins. Co.*, 372 A.2d 1218, 1226 (Pa. Super. Ct. 1977), an insurer may defeat a bad faith claim "by showing that it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action." *Luse v. Liberty Mut. Fire Ins. Co.*, 411 Fed. App'x 462, 465 (3d Cir. 2011) (citing *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004) ("A reasonable basis is all that is required to defeat a claim of bad faith.")). "Mere negligence or bad judgment is not bad faith." *Id.* (citing *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994)).

The Court finds that Plaintiffs have failed to meet their heightened summary judgment burden of coming forward with clear and convincing evidence that Allstate lacked a reasonable basis for denying their claim. In short, whether ultimately resolved in Plaintiffs' favor or not, the same factual issues relevant to Allstate's defense of Plaintiffs' breach of contract claim affirmatively demonstrate that Allstate's investigation of the fire loss raised sufficient questions to support its decision to deny the claim. Specifically, when a fire is of suspicious origin, questions of who resides in a property, for whom are losses claimed, where insureds stayed on the night of the fire, when an insured last left a property on the day of the fire and when he

returned, how a fire is discovered, whether neighbors and tenants might have a motive to start a fire, and an insured's actions increasing the insured against hazard, are all reasonable issues for the insurer to investigate before paying a fire loss claim. Although Plaintiffs have come forward with sufficient evidence to create a genuine issue of material fact on whether Allstate breached its contract duty to pay the fire loss claim, they have not satisfied their heightened summary judgment burden of coming forward with clear and convincing evidence that Allstate lacked a reasonable basis for denying the claim. Given the record of myriad inconsistencies disclosed by Allstate's investigation – which may be the product of a language barrier or an attempt to misrepresent facts – the Court cannot say as a matter of law that Allstate acted without a reasonable basis when it denied benefits or that it knew or recklessly disregarded its lack of reasonable basis. Accordingly, Allstate's motion for summary judgment on Plaintiffs' breach of contract claim is granted.

### C.      Insurance Fraud Claim

The Pennsylvania Insurance Fraud statute, 18 Pa. C.S.A. § 4117(a)(2), allows a civil cause of action against an insured, if the insured:

> knowingly and with the intent to defraud any insurer or self-insured presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains false, incomplete or misleading information concerning nay fact or thing material to the claim.

18 Pa. C.S.A. § 4117(a)(2). A person violates this statute by: "(1) presenting false, incomplete or misleading statements to [the insurer]; [(2)] that were material to the claim; and [(3)] which were knowingly made with an attempt to defraud." *Wezorek v. Allstate Ins. Co.*, No. 06-CV-1031, 2007 WL 2264096 at *14 (E.D. Pa. Aug. 7, 2007) (internal quotations omitted). Allstate claims

that Plaintiffs knowingly made several false and misleading statements that were material to the claim. (Def. Mot. ¶¶ 86-91.) However, as established above, when considering all the evidence in the light most favorable to the non-moving party, the Court is unable to conclude that Plaintiffs knowingly made false statements to Allstate. Thus, there remain genuine issues of material fact regarding whether Plaintiffs committed insurance fraud under the Pennsylvania statute. Accordingly, Allstate's motion for summary judgment on its counterclaim for civil insurance fraud must be denied.

## VI.    CONCLUSION

Questions of material fact exist, thus rendering summary judgment inappropriate on Plaintiffs' breach of contract claim and on Allstate's insurance fraud counterclaim. However, because Plaintiffs have failed to meet their summary judgment burden to come forward with clear and convincing evidence that Allstate lacked a reasonable basis for denying benefits, their bad faith claim fails as a matter of law. Thus, Defendant's Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART**.

An appropriate Order follows.

BY THE COURT:

  /s/ Lynne A. Sitarski                                
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE